William BLACKBURN,
Petitioner-Appellant,

v.

Dale FOLTZ, Respondent-Appellee.

No. 86–1815.

United States Court of Appeals,
Sixth Circuit.

Argued May 21, 1987.

Decided Sept. 17, 1987.

---

Martin A. Geer (argued), Ann Arbor, Mich., for petitioner-appellant.

Eric J. Eggan, Asst. Atty. Gen., Corrections Div., Lansing, Mich., Edgar L. Church, Jr. (argued), Asst. Atty. Gen., for respondent-appellee.

Before KEITH and NORRIS, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

Petitioner William Blackburn appeals from a district court judgment which denied his petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Blackburn was tried initially in September 1977 on three counts of armed robbery in Michigan. The proceeding ended in a mistrial due to a deadlocked jury. Blackburn was retried before a jury in November 1977 and convicted on all three counts. Blackburn contends on appeal that he was denied effective assistance of counsel at the second trial in three ways: Blackburn's counsel failed to move for suppression of Black-

burn's prior convictions and gave him erroneous legal advice concerning the possible use of those convictions if he testified; he failed to obtain the transcript from the first trial in order to impeach the sole identifying witness at the second trial; and he did not investigate or file a notice of Blackburn's alibi. For the reasons stated herein, we reverse the district court's denial of the writ.

## I

Blackburn was charged with the armed robbery of the Redmond family residence. At the first trial Mrs. Redmond testified that around 10 a.m. on February 17, 1976, two men came to her door to deliver a package. She testified that the men were standing approximately five feet away from her. Mrs. Redmond recalled that the man closer to her asked her to sign for the box. This man was Anthony Zielinski who was apprehended shortly after the robbery with the stolen property on his person. Mrs. Redmond turned to a nearby desk to get a pen and when she turned back around, the men were wearing ski masks. Mrs. Redmond estimated that this all occurred in less than one minute's time. She testified that the man in a green ski mask, Zielinski, held a gun on her, while the other robber in a red ski mask went upstairs. Mrs. Redmond testified that Zielinski then tied her up face down on a bed. He did the same to her husband, who had been dressing in another room and did not see the men unmasked. Jewelry and part of a coin collection were taken.

At the trial Mrs. Redmond identified Blackburn as the robber who donned the red ski mask, but could not remember particulars about his appearance. She also stated that at the front door, the only time she saw the men unmasked, the man she identified as Blackburn "always looked toward the west.... [M]ost of the time I was only seeing a profile of his face, not a full view of his face.... [H]e was turned on an angle." Mrs. Redmond further testi-

fied that she identified one of the robbers from a photographic array shown to her by the police, but could not remember whether it was Zielinski or the defendant.

Zielinski, who pled guilty to armed robbery, also testified for the prosecution at the first trial. He admitted that he pled guilty to the armed robbery in exchange for certain benefits from the state. He also admitted that his testimony against Blackburn was partly motivated by revenge. He testified that he, Blackburn and Joe May, who was tried separately,[1] planned the robbery. Zielinski testified that he and Blackburn committed the robbery after May drove them to the Redmonds' residence. Zielinski stated that Blackburn held a gun on Mrs. Redmond while he ran upstairs to ransack the house. Zielinski also testified that when he came downstairs Blackburn told him to tie up the Redmonds. Zielinski recalled that he telephoned May to come pick them up. When May was late, Zielinski testified that he went outside to look for him and that, when he shortly thereafter saw a man run from the house, he knew that the plan had fallen apart. Zielinski testified that he saw a police car pull up at the house and he quickly left the immediate area. Zielinski stated that he saw Blackburn and May drive past him, but they did not stop to pick him up. Zielinski testified that he went into a doctor's office to telephone a cab. He was apprehended there with the stolen property, a knife, and green ski mask on his person.

Two other witnesses testified that they saw a man wearing a green mask at the Redmonds. Neither saw the other robber. As indicated above, the jury was unable to reach a verdict and a mistrial was declared.

At the second trial conducted in November 1977 Mrs. Redmond again testified. Although she still maintained that Blackburn was the robber, her testimony differed from the first trial in some respects. She testified that she was no more than three feet away from the robbers at the

---

**1.** May was convicted, but his conviction was reversed by the Michigan Court of Appeals. He

was not retried.

front door. She also testified that she talked to them about ten minutes and that she could see the full faces of both men. Mrs. Redmond also stated that she selected Blackburn's photo from the photographic array. Mrs. Redmond initially stated that one ski mask was blue, but on seeing the exhibit in the courtroom, corrected herself to state that it was red. Zielinski's testimony remained essentially unchanged. Unlike the first trial, Blackburn was convicted on all counts, and was sentenced to two concurrent life terms and a third term of 60 to 90 years.

The Michigan Court of Appeals affirmed the conviction. *People v. Blackburn*, 94 Mich.App. 711, 290 N.W.2d 61 (1980). The Michigan Supreme Court denied Blackburn's request for review. *People v. Blackburn*, No. 64671 (Mich.S.Ct. Nov. 19, 1981). In October 1981 Blackburn filed for a writ of habeas corpus. Then District Court Judge Guy ordered an evidentiary hearing on Blackburn's claim of ineffective assistance of counsel with regard to counsel's failure at the second trial to move for exclusion of prior convictions, failure to investigate Blackburn's alibi defense, and failure to procure the transcript from the first trial for impeachment purposes. The evidentiary hearing was held before a magistrate on September 21, 1982.[2] On March 21, 1985, the magistrate issued a report and recommendation for denial of the petition. Blackburn timely filed objections to the report. Judge Hackett, to whom the case was reassigned, denied the petition on August 8, 1986. Blackburn then timely filed his notice of appeal on September 5, 1986.

## II.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-pronged test for determining whether counsel's representation of a criminal defendant at trial or a capital sentencing proceeding is so deficient as to require reversal of the defendant's conviction:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. Under the *Strickland* test, a reviewing court's "scrutiny of counsel's performance must be highly deferential," and must strongly presume that counsel's advocacy fell "within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. In evaluating counsel's performance the court should also "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. at 2066. A reviewing court must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Id.* at 689–90, 104 S.Ct. at 2065–66; *Kimmelman v. Morrison*, 477

---

**2.** At this point in the proceedings, the state claimed that Blackburn's failure to request an evidentiary hearing or move for a new trial before the trial court with regard to the issue of ineffectiveness of counsel constituted a state procedural default that precluded habeas corpus review of his claim under *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). After examining the record the magistrate determined that the state appellate court did not rely on the alleged procedural default in denying

Blackburn's request for review, so there was no bar to federal habeas corpus review. *See Meeks v. Bergen*, 749 F.2d 322, 325 (6th Cir.1984). Although the state waived any right of appeal on this issue by not objecting to the magistrate's report and recommendation, *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981), we note our agreement with the magistrate's analysis and with the district court's adoption of the magistrate's recommendation on this point.

U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). Although the district court's findings of fact are subject to the clearly erroneous standard of review, Fed.R.Civ.P. 52(a), the performance and prejudice components of the *Strickland* test are mixed questions of law and fact freely reviewable by the appellate court. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Meeks v. Bergen,* 749 F.2d 322, 327 (6th Cir.1984). With these principles in mind, we turn to the merits of Blackburn's argument that he was denied effective assistance of counsel as guaranteed him by the Sixth Amendment.

## III.

■ Blackburn first asserts that the failure of his counsel, Mr. Girard, to move for suppression of his three prior convictions deprived him of effective assistance of counsel. These three prior convictions were: a 1945 larceny conviction; a 1948 armed robbery conviction; and a 1977 conviction for aiding and abetting the carrying of a concealed weapon in an automobile. At the magistrate's evidentiary hearing, Girard testified that he believed that such a motion was unnecessary because Blackburn had signaled his intent from the beginning not to testify. Girard also recalled that he advised Blackburn that if he were to testify on his own behalf, the prosecution would probably produce Joe May as a damaging rebuttal witness. Girard did not recall advising Blackburn during the second trial that all prior convictions could be used against him. However, Blackburn testified at the evidentiary hearing that he told Girard that he wanted to testify after the prosecution had rested at the second trial, but Girard advised him that the prosecution could impeach him "back to day one."

The district court accepted Girard's testimony that Blackburn did not want to testify and determined that under the circumstances Girard did not seek suppression as "part of a deliberate and reasonable trial strategy." However, in so finding and concluding the district court seems not to have taken into account a critical exchange between Girard and Blackburn set forth in the second trial transcript:

MR. GIRARD: At this juncture I would like to briefly on the record ask Mr. Blackburn if he desires to take the witness stand and testify on his own behalf at this trial. It is my understanding he does not, and I would like to just indicate on the record that he has been appropriately advised of his constitutional rights and principles.

Mr. Blackburn has handed to me for presentation to this Court a citation of the People versus Trombley located in Michigan Court of Appeals 67. Mr. Blackburn has reason to believe this citation precludes the Prosecuting Attorney's cross examination of him pertaining to his criminal record dating more than ten years from the date in question. I have advised Mr. Blackburn that my understanding of the law does not so indicate, and that *it is my opinion that if he does take the witness stand, the Prosecution can, in touching upon his credibility as a witness, probe any possible criminal record he has from the day he began life to today's date.*

. . . . .

I'd like to ask Mr. Blackburn on the record if he desires to take the witness stand, and if he well appreciates his constitutional rights and principles and what rights he does not waive by not taking the stand. I want him to acknowledge the fact that if he does not take the witness stand, neither the Prosecution nor the Court in its charge can make any comment about him not taking the stand. In fact, the Court will make a specific charge of law to the jury suggesting that the mere fact that he did not take the witness stand cannot be utilized as evidence against him.

Mr. Blackburn, do you desire to take the witness stand—

DEFENDANT BLACKBURN: No.

MR. GIRARD:—and testify in your own behalf?

I am satisfied he is taking the right step and making the right decision.

THE COURT: Very well, Mr. Girard. (emphasis added)

The record corroborates Blackburn's testimony and casts significant doubt on Girard's recollection. More importantly, the district court's error in this regard led it to the unsupportable conclusion that Girard's failure to seek suppression was "part of a deliberate and reasonable trial strategy."

Mr. Girard's recitation of the law regarding admissibility of prior convictions was clearly wrong (and which, curiously, elicited no correction from the bench) and cannot be said to constitute reasonable strategy. Although the Michigan Rules of Evidence had not yet been adopted at the time of Blackburn's trial, the two older convictions would have been suppressed upon motion, because they were uncounseled, *Loper v. Beto*, 405 U.S. 473, 483, 92 S.Ct. 1014, 1019, 31 L.Ed.2d 374 (1972), and they were very old, *People v. Robinson*, 79 Mich.App. 145, 164–65, 261 N.W.2d 544, 554 (1977). It is also by no means certain that even the more recent 1977 concealed weapons conviction would have been used to impeach Blackburn. Under Michigan law at that time, as well as under the current Michigan Rules of Evidence, factors to be considered in determining the admissibility of a prior conviction include: "the nature of the prior offense, whether the conviction was for substantially the same conduct as that for which the accused is on trial, and the effect on the decisional process if the accused does not testify for fear of impeachment by prior convictions." *People v. Hughes*, 411 Mich. 517, 520, 309 N.W.2d 525, 526 (1981). As stated by the Michigan Supreme Court the purpose to be served in conducting this analysis is:

1) To put before the jury only those prior convictions indicative of the defendant's disposition toward truthfulness and veracity; and

2) To keep from the jury those convictions which, although they may be indicative of defendant's disposition toward truthfulness, may interfere with the jury's ability to determine the defendant's guilt or innocence on the basis of the evidence.

*Id.* at 520–21, 309 N.W.2d at 526–27. Under this analysis even the 1977 conviction for aiding and abetting the carrying of a concealed weapon might have been suppressed inasmuch as evidence of that conviction is not probative of Blackburn's veracity and it deterred Blackburn from testifying. Moreover, since possession of a weapon is an element of the charged crime, *People v. Lloyd*, 5 Mich.App. 717, 722, 147 N.W.2d 740, 743 (1967); *see* M.C.L.A. 750.-529, the judge could have determined that evidence of the prior conviction would be unduly prejudicial.

Regardless of the outcome of the admissibility determination regarding the 1977 conviction, had Girard correctly stated the well established law, Blackburn would have had a meaningful opportunity to decide whether to testify knowing that he could possibly be impeached by only one concealed weapons conviction and not by his two other convictions, one, importantly, for armed robbery, the very charge for which he was on trial. Counsel's error takes on added significance in view of the fact that as a practical matter no viable defense was presented on Blackburn's behalf. Thus, we cannot agree with the trial court's determination that counsel's failure to move for suppression "was part of a deliberate and reasonable trial strategy." Counsel's failure to move for suppression and his legal advice to Blackburn was based, not on strategy, but on mistaken beliefs and "a startling ignorance of the law." *Kimmelman*, 106 S.Ct. at 2588–89. As such, we cannot escape the conclusion that Girard's performance in this regard was deficient and "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

■ Blackburn also alleges that Girard's failure to file a notice of alibi and to investigate potential alibi witnesses deprived him of effective assistance of counsel. Blackburn testified at the evidentiary hearing that he gave Girard names of three potential alibi witnesses: "Bill" the bartender at the Camelot Bar, Guy Reed, and William Campbell. He also told Girard that his mother would help with an alibi

defense. Girard testified that he contacted Blackburn's mother, but that she was not able to provide names of potential witnesses. Girard stated that he made one short, unsuccessful trip to the Camelot Bar, but, feeling unsafe there, left shortly after he arrived with no new information. Girard testified that he did not recall the name of Reed or Campbell in connection with his investigation. However, Girard's file contained a letter from Blackburn dated May 31, 1977, setting forth Campbell's name and address. The file also contained a handwritten note on a letter dated November 2, 1977, stating: "Have Bill Campbell called...." We also note the fact that Campbell testified at Joe May's trial one year earlier. At the evidentiary hearing Campbell testified that he was walking his dog about 10:30 a.m. on the date of the robbery and saw Blackburn at that time. Campbell alleged that he left messages for Blackburn's lawyer a couple of times, but that his calls were not returned. Campbell stated that he did not make any effort to call Blackburn's lawyer until a couple of months after Blackburn's arrest, nor did he volunteer any alibi when the police came to his apartment to look for Blackburn.

Although Girard did make one trip to the Camelot Bar to investigate possible defenses, he for no apparent reason failed to investigate a known and potentially important alibi witness. Under *Strickland* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066. *Accord Beasley v. United States* 491 F.2d 687 (6th Cir.1974) (defense counsel has a duty to investigate "all apparently substantial defenses"). Further, American Bar Association standards, which provide guidance as to what constitutes "reasonable" professional conduct, *see Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986); *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65, also mandate counsel's duty to investigate all leads relevant to the merits of the case. ABA Standard for Criminal Justice 4–4.1, 4.54–4.55 (1980). Viewing Girard's omission under the circumstances present at that time, and with deference to his professional judgment, we believe the failure to locate and question Campbell constituted ineffective representation outside the wide range of professionally competent assistance. Counsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

■ The third alleged instance of ineffective assistance of counsel involves Girard's failure to obtain the transcript of the first trial in order to impeach Mrs. Redmond, the victim and key identifying witness at both trials. At the evidentiary hearing Girard acknowledged that the critical portion of Mrs. Redmond's identification testimony concerned "the short duration of her observation of the individual who she said was Billy Blackburn and the vantage point she had in seeing his profile." Moreover, Girard at that hearing all but admitted that weakening Mrs. Redmond's testimony was the only plausible hope Blackburn had for acquittal:

A For all intents and purposes we had no defense, because Mr. Blackburn indicated that he was not going to take the witness stand. We could not sufficiently locate witnesses that would serve as a purpose of alibi, and we went to trial in a desperate attempt to preclude the prosecution from establishing the burden of proof. Our game plan was that we felt that Mr. Zalinski's [sic] testimony could be impeached because of the type of individual he was. We further felt that the testimony of Mrs. Rudmun [sic] was not as concrete as the prosecution wanted it to be....

Q Was there any evidence at trial, that you attempted to produce at trial that Mrs. Redmun [sic] had misidentified the petitioner?

A There was no evidence other than her previous testimony.

Despite this knowledge, Girard expressed his belief that impeaching Mrs.

Redmond would not be necessary or even desirable:

> [T]he only necessity or requirement that I would utilize in procuring the transcript of the testimony of her first trial would be to impeach her. I had the benefit of cross-examining Mrs. Redmond on two different occasions, and I knew that procedure of attempting to impeach her would be emotionally damaging on the stand because of her emotionality and how she elicited sympathy from everyone in the courtroom. I was not going to utilize that procedure of attempting to impeach her, and I was under the impression that I wouldn't have to.

Even viewing Mr. Girard's decision with considerable deference to his professional judgment, under the circumstances of this case in which no other defense was apparent to counsel, the failure to procure the transcript for purposes of impeaching Mrs. Redmond was untenable.[3] Throughout the evidentiary hearing Girard acknowledged the centrality of Mrs. Redmond's testimony to the prosecution's case and the vital importance of weakening her testimony; yet he failed to pursue the one obvious and only logical means of diminishing her identification testimony—procuring the transcript of Mrs. Redmond's previous testimony in order to impeach her with prior inconsistent statements. When no other defense was available in counsel's view, the failure to prepare for effective impeachment of the sole eyewitness based on a hunch that her testimony would not differ from the first trial was "unreasonable under prevailing professional norms and ... was not sound strategy." *Kimmelman*, 106 S.Ct. at 2588; *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065. Contrary to what the district court concluded, Girard's representation in this regard was deficient.

■ Although we have addressed the above errors individually for discussion purposes, it is important to note that we have considered them within the context of counsel's *overall* performance and in view of all the facts in the record. *See Kimmelman*, 106 S.Ct. at 2589; *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Having thus concluded that Girard's performance was deficient under the *Strickland* guidelines, we turn to the prejudice component of the *Strickland* test. Under *Strickland* "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Mr. Girard himself unknowingly summarized the prejudicial impact of his combined errors in acknowledging at the evidentiary hearing that Blackburn "had no defense, because [he] indicated he was not going to take the witness stand, [and] [w]e could not sufficiently locate witnesses that would serve as a purpose of alibi, and we went to trial in a desperate attempt to preclude the prosecution from establishing the burden of proof." Blackburn did not testify in his own behalf only because Girard had given him erroneous legal advice on the admissibility of his prior convictions. William Campbell, a possible alibi witness, was not available to testify as a result of Girard's negligently insufficient investigation. Having precluded Blackburn from testifying in his own defense or from introducing alibi witness testimony, Girard then failed to take any meaningful step to impeach and diminish the identification testimony of Mrs. Redmond, the sole eyewitness to the crime.

Contrary to the district court's finding that Mrs. Redmond's testimony at both trials was "substantially the same" and that impeachment would have been unlikely, a full review of both trial transcripts reveals critical differences in Mrs. Redmond's iden-

---

3. The district court accepted Girard's testimony at the evidentiary hearing that he unsuccessfully moved the trial court for a transcript of the first trial. However, the district court overlooked Girard's statement on the record at the second trial that, contrary to his client's demand, he was not requesting the transcript due to the delay it would cause. Thus, the district court's finding on this point was clearly erroneous, and may have contributed to the improper conclusion it reached regarding the reasonableness of Girard's advocacy.

tification testimony regarding the duration of her opportunity to observe the robber unmasked and the vantage point from which she could see his face. At the first trial on cross-examination Mrs. Redmond stated with regard to the length of time she saw the robbers unmasked:

A. Now, that was all within one minute's time, I'm sure it couldn't have been much longer.

Q. The whole thing happened fast, didn't it?

A. It sure did.

. . . .

A. I didn't look at the man that much.

Q. Your observation of the men on the porch was a short period was it?

A. That's right.

However, at the second trial Mrs. Redmond testified as follows:

(Direct Examination)

Q. About how long did you talk to them before they came in?

A. I would really say about ten minutes.

Q. Ten minutes?

A. ... Maybe not quite that long. I don't know.

(cross-examination)

Q. You indicated today ... that you felt you'd observed them without their masks for ten minutes?

A. Approximately, yes.

Q. Haven't you previously testified that it was a matter of seconds as opposed to ten minutes?

A. No, never, not seconds.

Q. No? Never?

A. No.

Without recourse to the first trial transcript, Girard was forced to let Mrs. Redmond's testimony stand and was unable to put before the jury her prior inconsistent testimony that she saw the robbers unmasked for a minute's time at most.

Mrs. Redmond also testified at the first trial:

Q. How far away were you from these two men when you met them at the door?

A. About five feet away.

. . . .

A. One thing I did notice about the man, he never turned his face.

Q. Never turned his face in what direction?

A. Toward me, he always looked towards the west. In other words, most of the time I was only seeing a profile of his face. I could see a lot of it, but he never turned his face in one direction or another.

At the second trial, she testified differently on direct examination:

Q. Would you tell us how far away you were from these two men when this conversation was going on?

A. Not much further than three feet at the very most.

Q. Was anything obstructing your vision whatsoever?

A. No.

Q. All right. Now, could you see their full faces?

A. Yes.

Q. That's both men; is that correct?

A. Both men.

On cross-examination she testified as follows:

Q. Didn't you only see a profile? Didn't you previously tell us....

A. No, I told you before ..., the other time when we had this same situation, I told you I did not see maybe part. I saw his profile because I could see that, but I could see his face directly, but there was one side I probably didn't see as clearly as the other.

At the second trial Mrs. Redmond also testified without hesitation that she definitely picked out Blackburn's photo from an array shown to her by police. At the first trial she stated, "I can't remember whether it was [Blackburn] or Mr. Zielinski that was shown to me at the time." Girard did not challenge these inconsistencies which were highly probative of the reliability of Mrs. Redmond's identification of Blackburn. Indeed, Girard may not have been fully aware of inconsistencies without the aid of

the prior trial transcript. Clearly, the lack of prior transcript hampered, if not precluded, effective cross-examination of the key identifying witness.

The importance of Mrs. Redmond's testimony to the jury in reaching its decision cannot be gainsaid. All of the physical evidence linked *only* Zielinski to the crime. Moreover, Zielinski testified against Blackburn, as the jury was aware, only after pleading guilty to the armed robbery and in exchange for considerable benefits from the state—he would not have to serve his sentence in the Michigan Department of Corrections, where he feared for his life; he would not be charged as an habitual offender despite his lengthy criminal record; and a minimum sentence would be recommended by the state on the armed robbery conviction.

We cannot escape the conclusion that counsel's errors, in combination, effectively deprived Blackburn of a meaningful defense. The deficiencies left the only credible identifying witness's testimony virtually unchallenged and this court has taken occasion to express its grave reservations concerning the reliability of eyewitness testimony. *See, e.g., Wilson v. Cowan,* 578 F.2d 166, 168 (6th Cir.1978). In this regard we mention that Mrs. Redmond's initial testimony, facially entitled to the greater belief, was that she saw Blackburn for less than a minute, and only in profile. Counsel's deficient performance further foreclosed the jury from hearing valuable countervailing evidence in the form of alibi witness testimony, Blackburn's own testimony, and/or Mrs. Redmond's prior inconsistent statements. Due to the combined errors of counsel, Blackburn was unable to subject the prosecution's case to " 'the crucible of meaningful adversarial testing'— the essence of the right to effective assistance of counsel." *Martin v. Rose,* 744 F.2d 1245, 1250 (6th Cir.1984) (citing *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984)). The errors rendered the adversarial process and resulting conviction unreliable. *See Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071.

One further factor should be taken into account. Far from being an open and shut case, the fact that the evidence against Blackburn was not overwhelming is clearly established by the fact that the jury was unable to reach a verdict at the first trial.

Under the circumstances of this case the errors were prejudicial because there is a reasonable probability that, absent the errors, the jury would have had a reasonable doubt regarding Blackburn's guilt. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. Accordingly, the judgment of the district court is reversed and the case is remanded to the district court with instructions to issue the writ of habeas corpus unless the State of Michigan grants Blackburn a new trial within a reasonable period of time.