# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 69390-5-I |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| MICHAEL MOCKOVAK, | ) | PUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | FILED: June 6, 2016 |
| | ) | |

2016 JUN -6 AM 9:35 COURT OF APPEALS DIV 1 STATE OF WASHINGTON FILED

VERELLEN, C.J. — To establish ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that the deficiency prejudiced him. In 2011, a jury convicted Michael Mockovak of attempted first degree murder, solicitation to commit first degree murder, first degree theft, and conspiracy to commit first degree theft. We affirmed the convictions on direct appeal. Mockovak subsequently filed this personal restraint petition contending that his trial counsel was ineffective for failing to support his entrapment defense with expert testimony that he suffers from "learned helplessness." Because Mockovak does not establish a viable ineffective assistance claim, we deny his petition.

## FACTS

Mockovak's charges arose from his attempt to hire Russian hitmen to murder Dr. Joseph King, his business partner in a chain of Clearly Lasik refractive eye surgery

centers. Mockovak plotted with Clearly Lasik's information technologies director, Daniel Kultin, to have King and the company's former chief executive officer, Brad Klock, murdered. Mockovak did not know Kultin was also working as an informant for the Federal Bureau of Investigation (FBI) and wore a concealed recording device during several of their conversations.

In late 2008, Mockovak approached Kultin about having Klock murdered. Klock had sued Clearly Lasik for wrongful termination, and Mockovak intimated that a person like "Klock would not go far in Russia."[1] Kultin remembers a conversation during this time in which Mockovak referenced Klock's civil case and suggested Kultin may have "friends or somebody, . . . some Russian that can just put an end to it . . . rather than the legal way."[2] Kultin indicated Mockovak made these comments "maybe in a joke way," but not as a "funny joke."[3] Mockovak had previously joked with Kultin on several occasions about Kultin being in the Russian mafia due to Kultin's Russian accent and daily attire of suits and ties.

In early 2009, Mockovak told Kultin that Klock would be traveling to Europe and this would be a good opportunity for something to "happen" to Klock.[4] This conversation distressed Kultin, who believed Mockovak wanted Klock killed. Kultin then contacted his father, who eventually put him in contact with FBI agent Lawrence Carr.

---

[1] Report of Proceedings (RP) (Jan. 24, 2011) at 118.

[2] Id.

[3] Id.

[4] Id. at 121.

Agent Carr instructed Kultin that he should "never ever bring the subject [of murder] up with [Mockovak] again."[5] Instead, Kultin should only tell Mockovak he was visiting friends in Los Angeles, including a friend Mockovak believed to be a member of the Russian mafia. This would give them a "better idea of what Dr. Mockovak was thinking."[6] Agent Carr further instructed Kultin that if the discussion of his trip to Los Angeles "should spark conversation about murder, that he was not to have any part of that discussion. He was only to listen and to not contribute whatsoever to it."[7] Over the next two months, Mockovak and Kultin did not discuss the matter.

On August 3, 2009, Mockovak called Kultin and cryptically asked if they could meet to discuss "that thing that we talked about before."[8] They met in a parking lot two days later. Mockovak expressed his frustration about Klock's lawsuit and that he wanted something to be "done to him."[9] Mockovak also mentioned his partner King had a $4 million life insurance policy if "something were to happen to him" as well.[10] Kultin told Mockovak he would "make some calls" to get more information.[11]

Mockovak and Kultin met again on August 11, 2009. In a conversation recorded by the FBI, Mockovak answered "yeah" when Kultin told him he had "made some calls"

---

[5] RP (Jan. 20, 2011) at 69-70.

[6] Id. at 73.

[7] Id.

[8] RP (Jan. 24, 2011) at 131.

[9] Id. at 136.

[10] Id. at 134.

[11] Id. at 136.

3

to the hitmen saying Mockovak was interested in killing Klock.[12]  When Kultin told

Mockovak "they" could do it, Mockovak replied "Oh good.  Good.  Good."[13]  Mockovak

also answered "yeah" repeatedly when discussing killing methods, but finally laughed,

saying "I don't care" when asked how he wanted Klock killed.[14]  Mockovak then initiated

a discussion about laundering the money to pay the hitmen and Kultin.

Kultin asked Mockovak if he wanted Klock murdered before his deposition in the

lawsuit was completed.  Mockovak responded, "No, no, no, no, I want to go ahead and

have the deposition happen first."[15]  Mockovak explained that "[i]f it appeared that Klock

would drop his suit, then the murder, which Mockovak described as a purely 'financial

thing,' would be unnecessary."[16]  Mockovak told Kultin that he must make this clear to

the hitmen.

The remaining facts of this case were succinctly set forth in Mockovak's direct

appeal as follows:

> Kultin next met with Mockovak on October 20, 2009.  Kultin again
> wore a wire.  Mockovak first reported that the depositions in Klock's
> lawsuit had been "outstanding."  Mockovak told Kultin that there was
> nothing urgent about Klock, whom he described as nothing more than a
> "fly on the wall," but that the situation with King was different.  Mockovak
> speculated that King was attempting to force him out of the business
> completely.
>
> Mockovak told Kultin that King would be traveling to Australia in
> November and showed Kultin the flight information he had discovered
> during his investigation the previous week.  Kultin told Mockovak that the

---

[12] Ex. 54 (Aug. 11, 2009) at 34.

[13] Id.

[14] Id. at 40-41.

[15] Id. at 43.

[16] State v. Mockovak, noted at 174 Wn. App. 1076, 2013 WL 2181435 at *2.

4

cost of a murder might be less expensive in Australia, which Kultin described as "a wild place." Mockovak replied, "Oh that's good" and "That's what I'm thinking." Kultin said that he would ask his friend whether the murder could be accomplished in Australia. Mockovak told Kultin that he had secreted enough cash to pay for the hit.

On October 21, 2009, Mockovak called his insurance company and requested a copy of the policy on King's life. The policy . . . named Mockovak as the beneficiary.

Kultin and Mockovak met again on October 22, 2009. In this conversation, which was also recorded by the FBI, Kultin told Mockovak that he had spoken to his friend and that "Australia is actually very easy." He told Mockovak that King could be killed "as a robbery" or "as an accident." Mockovak remarked that Australia was far away and that any investigation of King's death would never "come back here ever." Kultin asked whether King's wife, Holly, was also to be killed, and Mockovak told him "no." Mockovak told Kultin that he had been gathering cash and had by that time set aside $11,000. The two men then discussed when the post-murder payment would be required.

. . . .

Mockovak and Kultin next met to discuss the details of the plan on November 6, 2009. Mockovak described his attempts to discover additional details of King's travel plans. Mockovak told Kultin that he was trying to sell one of the Canadian surgical centers in anticipation of King's death. He said that he was excited about running the business without interference from King.

Kultin asked Mockovak how he would like the murder to be accomplished. Mockovak proposed that King could be killed while he ran on the beach. When Kultin inquired whether Mockovak would like King's body to be found, Mockovak replied that having the body discovered would be better for purposes of collecting the proceeds of the insurance policy. Mockovak told Kultin that he did not care whether the killers delivered any message to King before murdering him. Instead, Mockovak explained, "I just want him the fuck out of my way."

Kultin then asked Mockovak whether he had "thought this through," and Mockovak replied that he was a "little uneasy." Kultin asked him whether he was going to "freak out" if the murder occurred, and Mockovak told him that he would not. Mockovak explained that although part of him was uneasy, he did not want to put himself at the mercy of an arbitrator or

a judge. He told Kultin that King really "ha[d] this coming." Killing King, Mockovak explained to Kultin, was "the only sure way."

Mockovak and Kultin then discussed how to launder the post-murder payment. Mockovak was concerned that his bank account activity would look suspicious if he were to withdraw a large sum of money shortly before King's death. The two men determined that Mockovak would purchase an expensive (but fake) watch from a jeweler associated with the same criminal organization for which the hit-men were working. Kultin emphasized that the second payment must be made or that both Mockovak and he would be in danger. Mockovak told Kultin that he understood and that he had no desire to get "serious people like this upset."

. . . .

Near the end of the conversation Mockovak told Kultin that he had often considered going to the garage of Clearly Lasik and killing King himself. Kultin replied, "don't do that." He told Mockovak that it was a "good thing you came to me because otherwise you would have done it the wrong way."

Mockovak and Kultin agreed to meet the following day near Sea-Tac International Airport in order for Mockovak to deliver the first payment. The conversation concluded with Mockovak reiterating that the choice of Australia for the murder was "almost too good to be true."

On November 7, 2009, Mockovak and Kultin spoke by telephone. Mockovak told Kultin that he had successfully stolen a portrait of King and his family from the Clearly Lasik office in Vancouver, Washington. He told Kultin that he was pleased that they had met on the previous night because it had given him 24 hours to contemplate the murder plan. Mockovak said, "It's absolutely the right thing to do."

That night, Mockovak and Kultin met at a soccer park near the airport. The meeting was recorded by the FBI. The men went into a restroom where, as they had planned, Mockovak gave Kultin $10,000 in cash. Mockovak "wanted to make sure" that he would get his money back in the event that the hit was unsuccessful. Kultin replied that Mockovak would not lose his money.

Mockovak then gave Kultin the photograph of King and his family. He explained that King now had three children and that the children were slightly older than they appeared in the picture. Kultin assured Mockovak that the picture of King's wife would be sufficient for the killers to identify

King. Mockovak also gave Kultin a piece of paper on which he had handwritten King's flight information. He told Kultin, "we're ready."

On November 11, 2009, at the direction of the FBI, Kultin called Mockovak and told him that everything was in place for the murder. He explained that the killers had located King in Australia and that they were now watching him. Kultin told Mockovak that he was expecting to hear news of the murder within several days. Mockovak responded, "That sounds good."[17]

Mockovak was arrested the next day. The State charged him with solicitation to commit first degree murder of King, attempted first degree murder of King, solicitation to commit first degree murder of Klock, conspiracy to commit first degree theft, and attempted first degree theft.

Mockovak retained attorneys Jeffrey Robinson, Colette Tvedt, and Joseph Campagna to defend him against these charges. Robinson was lead counsel and has practiced criminal defense for over 30 years in Washington. The defense team presented an entrapment defense at trial.

A jury acquitted Mockovak of solicitation to murder Klock, but found him guilty of the remaining charges. Mockovak appealed. In an unpublished opinion, State v. Mockovak, this court affirmed his convictions.[18]

Mockovak now files this timely personal restraint petition.

## ANALYSIS

To obtain relief through a personal restraint petition, a petitioner must establish either constitutional error resulting in actual prejudice or nonconstitutional error that

---

[17] Id. at *3-5.

[18] Noted at 174 Wn. App. 1076, 2013 WL 2181435.

"'inherently results in a complete miscarriage of justice.'"[19] If a petitioner makes a prima facie showing of actual prejudice but the reviewing court cannot determine the merits of the claims solely on the record, the court should remand for a full hearing on the merits or for a reference hearing.[20] But "[t]his does not mean that every set of allegations which is not meritless on its face entitles a petitioner to a reference hearing. Bald assertions and conclusory allegations will not support the holding of a hearing."[21] A petitioner "must state with particularity facts which, if proven, would entitle him to relief" and must show that he has "competent, admissible evidence" to establish those facts.[22]

In his petition, Mockovak claims he suffered prejudicial constitutional error due to ineffective assistance of his trial counsel. Washington applies the Strickland v. Washington[23] test to determine whether counsel was ineffective.[24] To prevail, Mockovak must show both deficient performance and resulting prejudice.[25] To establish deficient performance, he bears the burden of showing that trial counsel's performance fell "'below an objective standard of reasonableness.'"[26] In assessing counsel's performance, this court "must make every effort to eliminate the distorting effects of

---

[19] In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990) (quoting Hill v. United States, 368 U.S. 424, 428, 82 S. Ct. 468, 7 L. Ed. 2d 417 (1962)).

[20] In re Pers. Restraint of Rice, 118 Wn.2d 876, 885, 828 P.2d 1086 (1992).

[21] Id. at 886.

[22] Id.

[23] 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[24] In Re Pers. Restraint of Yates, 177 Wn.2d 1, 35, 296 P.3d 872 (2013).

[25] State v. Humphries, 181 Wn.2d 708, 719-20, 336 P.3d 1121 (2014) (citing Strickland, 466 U.S. at 687-88).

[26] State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 688).

hindsight and *must strongly presume* that counsel's conduct constituted sound trial strategy."[27] It is Mockovak's burden to "show in the record the absence of legitimate strategic or tactical reasons" for counsel's alleged omission.[28] "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'"[29]

Mockovak contends his trial counsel's failure to buttress his entrapment defense with expert testimony regarding his "learned helplessness" was deficient performance. He alleges a psychologist told his counsel prior to trial that he had been sexually abused for years and had a "history of being easily manipulated and exploited."[30] The psychologist explained that "people who are repeatedly sexually abused as a child tend to develop the attitude that resistance to, or escape from the abuser, is futile, and this becomes part of their general response to people who seek to manipulate them."[31] In the psychologist's opinion, Mockovak's "history as a victim of childhood sexual abuse made him more vulnerable to pressure exerted by others to get him to do something he did not want to do, and thus made him more vulnerable to entrapment."[32] Dr. Natalie Novak Brown, a psychologist who evaluated Mockovak for this petition in November 2014, concluded that Mockovak's extensive childhood sexual abuse caused both

---

[27] Rice, 118 Wn.2d at 888-89 (emphasis added) (citing Strickland, 466 U.S. at 689).

[28] State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995).

[29] Grier, 171 Wn.2d at 33 (quoting State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)).

[30] Gonsiorek Decl. at 2, ¶ 5.

[31] Id. at 2, ¶ 6.

[32] Id. at 3, ¶ 9.

posttraumatic stress disorder (PTSD) and learned helplessness syndrome. Mockovak argues it was deficient performance not to present such expert opinions on learned helplessness in support of his entrapment defense.

But there are legitimate tactical reasons why defense counsel would elect not to introduce such evidence. For instance, such testimony would open the door to evidence that, rather than being suggestible and easily manipulated, Mockovak was considered manipulative and narcissistic by many of his longtime colleagues. Many sent letters to the sentencing judge describing Mockovak as an amoral, remorseless, and calculating sociopath, who referred to himself as Dr. Machiavelli and Dr. Evil. Thus, a defense portraying Mockovak as helpless and susceptible to the influence of others could have triggered the introduction of this damaging evidence and undermined Mockovak's entrapment defense.

Mockovak argues, however, that because Dr. Novak Brown believes he is a victim of PTSD and victims of PTSD are often aggressive, counsel could have countered any suggestion that incidents of aggressive behavior undercut his learned helplessness and entrapment defense. But even accepting that PTSD explains why Mockovak is not passive, it does not explain his past amoral, remorseless, and sociopathic manipulation of others. Such behavior is inconsistent with the proposition that Mockovak is suggestible and easily manipulated.

Mockovak also contends that his counsel's misunderstanding of the law, not trial strategy, is the reason counsel did not employ a learned helplessness theory. He points to several portions of the record in support of this claim. First, he points to the declaration of his attorney friend, Ronald Marmer. According to Marmer, during a

pretrial discussion about whether there was "a way to put the State to its burden of proof on the mens rea elements of the charges," trial counsel Tvedt stated that Mockovak had to choose between the defenses of diminished capacity and entrapment because he could not present both.[33] Second, Mockovak notes trial counsel Robinson's statement in open court that under Washington law, Mockovak had to admit to the charged offense before he could plead a defense of entrapment. Mockovak claims that because "the law does *not* require defendants to admit the offense in order to plead entrapment, and does *not* require an either/or choice between entrapment and diminished capacity," his counsel mistakenly believed that they could not present both defenses.[34] And he contends these mistakes resulted in counsel deciding not to introduce the learned helplessness testimony.

But even assuming counsel suffered from some misunderstanding of the law, it is the *conduct* of trial counsel, not counsel's understanding of legal principles, that is critical to a claim of deficient performance; "Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."[35] A misunderstanding of the law only supports deficient performance where that misunderstanding results in acts or omissions adverse to the defendant.[36]

---

[33] First Marmer Decl. at 3, ¶¶ 12-14.

[34] Br. of Pet'r at 24.

[35] Harrington v. Richter, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (citing Strickland, 466 U.S. at 688).

[36] Mockovak cites decisions that discuss a misunderstanding of the law as a basis for deficient performance, but in each of those cases, counsel's misunderstanding of the law resulted in conduct detrimental to the client. See, e.g., Williams v. Taylor, 529 U.S. 362, 395, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (counsel who failed to search public records for mitigation evidence about defendant's childhood, "not because

Here, Mockovak's counsel did not pursue a diminished capacity defense. Evidence of diminished capacity seeks to show that the State has failed to prove the mens rea of the charged crime. But there is no showing that Mockovak had a viable diminished capacity defense or that learned helplessness in this setting negated Mockovak's intent. Therefore, Mockovak fails to establish that any misunderstanding about the compatibility of diminished capacity and entrapment defenses resulted in an omission adverse to Mockovak's defense.[37]

Third, Mockovak points to Robinson's alleged post-verdict comment that the law of entrapment does not include a subjective component.[38] Mockovak claims Robinson must have rejected the learned helplessness evidence because he mistakenly believed entrapment was a wholly objective determination. This argument fails because any misunderstanding about the subjective and objective components of entrapment did not result in any deficient conduct by Mockovak's counsel. The entrapment instruction

---

of any strategic calculation but because they incorrectly thought that state law barred access to such records" held ineffective); Blackburn v. Foltz, 828 F.2d 1177, 1182 (6th Cir. 1987) (counsel's failure to move for suppression of defendant's prior convictions constituted deficient performance and was not reasonable trial strategy since counsel's erroneous understanding and recitation of the law resulted in misinforming defendant and depriving defendant of a meaningful opportunity to decide whether to testify); Washington v. Hofbauer, 228 F.3d 689, 702-03 (6th Cir. 2000) (counsel's failure to object to prosecutorial misconduct constituted deficient performance when that failure was due to clear inexperience or lack of knowledge of controlling law rather than reasonable trial strategy).

[37] We note that Robinson's open court statement occurred in the context of discussing the differences between federal and state court. But even ignoring that context, there still is no showing of a viable diminished capacity theory.

[38] Marmer offered his declaration that during a discussion in which he "referred to the 'subjective test' for entrapment," Robinson interjected, stating that he did not know where Marmer "got the idea that the test was subjective," and that "use of the word 'reasonable' in the standard jury instruction on entrapment plainly reflected an objective standard." First Marmer Decl. at 3-4, ¶ 16.

proposed by the defense and given to the jury contained both objective and subjective elements and correctly states the law.[39] Moreover, Robinson acknowledged the relevance of Mockovak's state of mind early in the case,[40] and clearly focused upon Mockovak's subjective state of mind in closing argument.[41] Mockovak fails to demonstrate any adverse effects from counsel's alleged misunderstanding of the law. He has not overcome the *strong* presumption that his counsel acted reasonably in declining to present evidence of learned helplessness. Accordingly, his claim of deficient performance fails.

Mockovak's ineffective assistance claim also fails because he does not demonstrate a reasonable probability that the outcome would have been different had evidence of his learned helplessness been presented.[42] Mockovak claims the evidence could have affected the verdict because the jury acquitted him of soliciting Klock's murder and some jurors mentioned in post-verdict interviews that "their decision to

---

[39] Mockovak's claim that trial counsel was ineffective for proposing this jury instruction was dismissed in this court's Order Referring in Part and Dismissing in Part dated May 8, 2015.

[40] RP (Jan. 12, 2011) at 23 ("I will indicate that given the nature of the charges and the nature of the defense, Dr. Mockovak's state of mind is clearly relevant.").

[41] RP (Feb. 1, 2011) at 6 ("Kultin understood who he was dealing with, and he understood how to get Michael Mockovak at his most vulnerable points; his ego and his insecurity."); RP (Feb. 1, 2011) at 12-13 ("Fear is definitely an element in what happened here, but in the soup, if you will, of entrapment, fear is just one element. It's one ingredient. The other ingredients are pouring fuel on the fire at every opportunity at Mockovak's most vulnerable positions in terms of the way he looks at the world.").

[42] See Yates, 177 Wn.2d at 36 (citing Strickland, 466 U.S. at 694). The "'likelihood of a different result must be substantial, not just conceivable.'" In re Crace, 174 Wn.2d 835, 843-44, 280 P.3d 1102 (2012) (quoting Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2014)).

convict on the attempted murder of King charge was a very close call."[43] Mockovak's argument is not compelling.

First, since 1909, Washington has followed the rule that jury deliberations may be inquired into only to evaluate a claim of serious misconduct.[44] "Neither parties nor judges may inquire into the internal processes through which the jury reaches its verdict."[45] Mockovak relies on the declaration of David Snyder, a private investigator who interviewed the jurors after the verdict was returned. But Snyder's declaration reveals the jurors' internal thought processes and deliberations. Here, there is no allegation of juror misconduct, and Mockovak offers no authority that analyzing prejudice includes reflections by jurors on what may have been important or persuasive to them.

Second, unlike the plan for Klock, Mockovak finalized the plan to kill King. He gave Kultin $10,000 in cash for King's murder, along with a photograph of King and his family and King's flight information. Mockovak responded, "That sounds good" when Kultin told him that the hitmen had located King in Australia and that everything was in place for his murder.[46] And, as set forth above, there was extensive evidence that Mockovak *initiated* discussions with Kultin about hiring Russian hitmen. Because Mockovak took concrete steps to perfect the plot against King, the acquittal as to vague discussions about Klock is not remarkable. There is no reasonable probability

---

[43] Br. of Pet'r at 45.

[44] Ralton v. Sherwood Logging Co., 54 Wash. 254, 256, 103 P. 28 (1909).

[45] State v. Linton, 156 Wn.2d 777, 787, 132 P.3d 127 (2006); see also Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 134-38, 368 P.3d 478 (2016).

[46] Ex. 54 (Nov. 11, 2009) at 4.

that the learned helplessness evidence would have changed the outcome of the trial.

Because Mockovak has not met the threshold requirement of presenting prima facie evidence to support his ineffective assistance claim, we deny his request for a reference hearing and deny his petition.

WE CONCUR: