**Johnny Edward SIMS, Petitioner–Appellee,**

v.

**Gary LIVESAY, Warden, Respondent–Appellant.**

**No. 91–5757.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1992.

Decided Aug. 3, 1992.

Douglas A. Trant (argued and briefed), Knoxville, Tenn., for petitioner-appellee.

C. Anthony Daughtrey, Asst. Atty. Gen. (argued and briefed), Office of Atty. Gen. of Tenn., Nashville, Tenn., for respondent-appellant.

Before: MERRITT, Chief Judge, JONES and BATCHELDER, Circuit Judges.

MERRITT, Chief Judge.

The State of Tennessee appeals the District Court's order granting the writ of habeas corpus to Johnny Edward Sims. Sims is currently serving a life sentence plus five years after having been convicted by a jury for murdering his wife, Shirley Sims, and for employing a firearm in the commission of a felony. The District Court, Judge Thomas Hull, determined that Sims was denied effective assistance of counsel as guaranteed by the Sixth Amendment. We agree with Judge Hull that Sims' trial counsel failed to meet the requirements of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, we affirm the decision of the District Court granting the writ.

## I.

Shirley Sims died from a bullet wound to the chest inflicted on the night of December 21, 1983. She was shot in the bedroom of her home with her own Smith and Wesson .38 caliber pistol. Her husband, Johnny Sims, rushed her unconscious, nude body to the hospital where she later died without regaining consciousness. Mrs. Sims reportedly had blood alcohol of .16 percent at the time of her death. Mr. Sims told hospital personnel that his wife had shot herself. A deputy sheriff, who was completing a routine incident report, later asked Sims whether his wife shot herself. Sims answered, "Not exactly." He then explained that he had heard his wife fire the gun twice; that he had gone into the bedroom; that he saw his wife with the gun; that he grabbed the gun; and that he thought he was holding it away from her when it discharged. After Mrs. Sims' death, and after Mr. Sims had been advised of his rights, Mr. Sims gave several other statements embellishing the details of the incident but never deviating from his general account that Mrs. Sims' death was accidental—that his wife was in bed, that she was intoxicated and was threatening to kill herself, that she fired a couple of shots, and that the fatal shot was fired when he tried to wrest the gun from her.

The state prosecuted Mr. Sims for first-degree murder. Because the petitioner is the only eyewitness to the shooting, the physical evidence gathered at the scene of the shooting was crucial to the state's case. A cocked pistol was found in the Simses' bathroom. The pistol contained four empty cartridges and one live round. Three slugs were found: one lodged in the victim's spine, and two that had passed through the mattress. The bed was discovered in a disheveled condition. Most importantly, for purposes of this petition, a quilt which lay on the bed was found to contain three bullet holes. Experts would later determine that each hole in the quilt was accompanied by "butterfly patterns" of gunshot residue. Gunshot residue was also found on the victim's hands.

### A. *Trial*

The state argued that the petitioner deliberately shot his wife during an argument as she sat naked in bed. Specifically, the state claimed that Mrs. Sims was shot at a distance, not during a hand-to-hand struggle as Mr. Sims contends. In support of this theory, the state noted that the Mrs. Sims' bullet wound was "clean," *i.e.*, there was no lead fouling, no lead stipling, no smoke fouling, and no tattooing around the wound. The state's chief witness was Dr. Blake, a forensic pathologist who conduct-

ed the autopsy on Mrs. Sims. Dr. Blake testified that if Mrs. Sims had been holding the gun when the fatal bullet was fired, the gun would not have been more than 13 or 14 inches from her chest. Tests conducted with the gun, however, showed that at this short range, tattooing would have resulted. Consequently, the state asserted, Mr. Sims must have shot Mrs. Sims from a distance, a state of affairs indicative of a deliberate, not accidental, shooting. The state accounted for the gunshot residue on Mrs. Sims' hands by claiming that she must have held up her hands fairly close to the gun in self-defense. Significantly, Dr. Blake did not examine the quilt, nor did the state offer the quilt into evidence.

Other physical evidence supporting the state's theory was a clump of hair torn from Mrs. Sims' scalp and the cocked pistol. The petitioner admitted that on the evening of her death, he and his wife had returned home from a bar and had a violent argument in the bedroom, during which he had grabbed her hair, pulling some of it out. After this altercation he said he left the bedroom, whereupon he heard two shots, and rushed back into the bedroom. The state seized upon the scalp injury to argue that the struggle between the Simses was a prelude to Mr. Sims' murder of his wife. As for the pistol, the implication was that Mrs. Sims would not likely have cocked it after shooting herself.

At trial, Sims repeated his story of the struggle for the gun and the accidental shooting. He said he threw the gun into the bathroom after the fatal shot was fired, although he could not explain how the gun got cocked. The defense also called Dianne Konkoly, from the Tennessee Bureau of Investigation. Konkoly had examined hand swabs taken from Mrs. Sims for gunshot residue. She testified that Mrs. Sims could have fired the fatal shot, but noted a possible discrepancy. Mrs. Sims was right-handed, yet her right hand yielded relatively low concentrations of gunshot residue. This finding suggested that Mrs. Sims likely had fired the gun with her left hand.

Burkett C. McInturff represented Sims at trial and on direct appeal. Although Sims told McInturff that the shooting was accidental, McInturff presented two defenses to the jury: accident and self-defense. Sims, in his sworn statements and trial testimony, however, never mentioned self-defense. Further, McInturff did not have Konkoly examine the quilt with its three gunshot holes and "butterfly patterns" of gunshot residue.

The jury convicted Sims of first-degree murder and employing a firearm in the commission of a felony. Sims' conviction was affirmed by the Court of Criminal Appeals of Tennessee, and the state Supreme Court denied his application for permission to appeal.

### B. Post–Conviction Proceedings

In state post-conviction proceedings Sims claimed that his trial counsel was ineffective. The most critical shortcoming, Sims alleged, was McInturff's failure to investigate the case. Specifically, Sims contended that it was McInturff's duty to obtain the services of a forensic expert to examine the quilt, its bullet holes, and its powder burns, and the fatal bullet for traces of fabric from the quilt. The petitioner claimed that these pieces of evidence would have established that the quilt was between Mrs. Sims and the pistol when the fatal shot was fired. The powder burns on the quilt, he alleged, account for the clean wound on Mrs. Sims' chest, and thus undermine the state's contention that Mrs. Sims must have been shot from a distance.

The state post-conviction court permitted the petitioner's forensic firearms expert to examine the quilt visually, but did not allow the expert to conduct independent testing of the gun and quilt. The Criminal Court for Sullivan County dismissed Sims' petition for post-conviction relief. The Court of Criminal Appeals and the State Supreme Court affirmed the dismissal.

### C. Federal Habeas Proceedings

After exhausting his state remedies, Sims sought federal habeas relief in the United States District Court for the East-

ern District of Tennessee. Sims' habeas petition raised two grounds. He claimed ineffective assistance of trial counsel. He also asserted that the state post-conviction court violated his due process rights by refusing to order the quilt to be handed over for independent examination. In November 1989, the District Court ordered the State Attorney General to deliver the quilt and other physical evidence used at trial to the petitioner's expert for independent examination. It also ordered the expert to deliver the results of the examination to the respondent and to the Court so that the Court could assess the need for a hearing. The Court subsequently denied the state's motion to reconsider its order.

A bench trial took place in January 1991. Two expert witnesses appeared on Sims' behalf. George Fassnacht, a forensic firearms examiner, testified that because three bullets were recovered and because there are three holes in the quilt, the bullet that struck Sims' wife probably passed through the quilt. He testified that had the quilt been between Mrs. Sims and the muzzle of the gun, it would have prevented powder residue from being discharged onto the area of the wound. As a result, the wound would resemble a distant-type wound. Regarding the three "butterfly patterns" around the bullet holes, Fassnacht explained that when a revolver is fired a tremendous amount of powder gas is blown out the side of the gun through the gap between the barrel and the cylinder, and that the gas is deposited as an irregular black stain. In examining these stains on the quilt, Fassnacht stated that they indicated that the blanket was around the gun during one of the firings, almost completely around the gun on another firing, and in somewhat less contact during the other firing. He concluded that the presence of the quilt should have been taken into consideration in determining the distance between the gun and the body when the gun was fired.

The testimony of Dr. Joseph Burton, the chief medical examiner for Atlanta and former Director of Forensic Pathology Training at Emory Medical School, was consistent with the testimony of Fassnacht, which in turn supported Sims' contention that the shooting was accidental. Dr. Burton noted that he served as pathologist for two of the counties registering the highest suicide rates in the nation (several hundred each year). He further stated that gunshot suicides are the most common form of suicide, and that in his experience, about 70% of adults who take their lives are under the influence of alcohol and/or drugs. He then pointed out that the two shots which Mrs. Sims fired between her legs could have been "hesitation or test shots," not atypical for suicides; that the bruise on the victim's wrist was consistent with Mr. Sims' story that there was a struggle for the gun; that a gunshot residue test done on the victim's hand indicated that she could have handled the gun or could have actually discharged the gun; and that the location and angle of the bullet wound on the chest were consistent with what an expert would expect to see in someone who is right handed and was attempting suicide. Dr. Burton also noted a discrepancy between Dr. Blake's description of the wound and Dr. Blake's conclusion that it was a distant wound. A so-called "abrasion collar" 10 millimeters in diameter surrounded the wound, which was only 5 millimeters in diameter. Dr. Burton claimed that where a bullet hole is 5 millimeters wide, "the abrasion collar typically in a distant gunshot wound should be about [one] millimeter wide." The fact that the abrasion collar was twice the diameter of the hole, said Burton, "leads me to wonder if it was indeed a distant gunshot wound." Dr. Burton concluded that "I would have to say that all of this evidence certainly suggests strongly the possibility that it was either an accident or she intentionally tried to take her life and did so."

In the Memorandum Opinion accompanying its May 1991 Order granting the writ, the District Court assessed Mr. McInturff's representation in light of the two-prong test for ineffectiveness set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> Mr. McInturff had an affirmative duty to have the physical evidence in this case examined to determine whether or not it

supported his client's testimony and to introduce that evidence which offered a plausible explanation for the most damaging elements of the state's case. Even without independent testing, introduction of the quilt would have offered a possible explanation for the minimal gunshot residue on Mrs. Sims' hands and the lack of powder burns and tattooing around her wound. Independent forensic testing of the quilt would have suggested that Mrs. Sims was attempting suicide. Testing of the bullet that killed her [for fabric residue] might have offered definitive proof that the bullet had passed through the quilt before entering her body.

... The Court has examined all of the factors raised by the petitioner and their cumulative effect on the outcome of the trial. It is convinced that a just result was not reached in the instant case and that Mr. Sims is entitled to a new trial.

The state appeals the District Court's judgment.

## II.

The state presents two arguments on appeal. First, it asserts that the District Court erred by failing to give the state court findings of fact the presumption of correctness required by 28 U.S.C. § 2254(d). The state argues that by ordering an evidentiary hearing, the District Court "substituted its judgment for that of the state courts" with respect to findings of historical fact. (Brief of Respondent–Appellant at 15). Second, the state asserts that the petitioner's attorney was not ineffective.

■ Beginning with the state's first argument, we note that the District Court had the authority to order an evidentiary hearing concerning the quilt. As the Supreme Court made clear in *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963), *overruled on separate grounds by Keeney v. Tamayo–Reyes*, — U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), "[i]n every case [the district judge] has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *See also Fowler v. Jago*, 683 F.2d 983, 987 (1982), *cert. denied, Marshall v. Fowler*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983). The state's argument—that in holding an evidentiary hearing the District Court thereby ignored § 2254(d)'s presumption of correctness—confuses the District Court's discretionary power to hold a hearing with the limitations on the District Court's power to set aside state court findings of fact.

■ Turning to the state's second argument, that Sims' trial counsel was not ineffective, the respondent concedes, as it must, that "a state court conclusion that counsel rendered effective assistance is a mixed question of law and fact, and thus not subject to [§ 2254(d)'s] presumption." (Brief of Respondent–Appellant at 14–15). *See also Adams v. Jago*, 703 F.2d 978 (6th Cir.1983). The District Court therefore reviewed *de novo* the state post-conviction court's conclusion that Sims' trial counsel was effective. Similarly, we review *de novo* the District Court's judgment that Sims' trial counsel was ineffective. *Strickland*, 466 U.S. at 498, 104 S.Ct. at 1958; *Blackburn v. Foltz*, 828 F.2d 1177, 1181 (6th Cir.1987), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988). We address each of *Strickland*'s two prongs in turn.

### A. *Reasonableness*

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In evaluating counsel's performance, "all the circumstances" must be considered. *Id.* at 688, 104 S.Ct. at 2065.

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Id.* at 688–89, 104 S.Ct. at 2065. What is more, judicial scrutiny of counsel's performance must be highly deferential. The court should begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

The Supreme Court recognized that in the context of ineffective assistance claims based on counsel's "failure to investigate," the temptation to rely on hindsight is particularly strong. Consequently, the Court made clear that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Id.* at 690, 104 S.Ct. at 2066. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or *to make a reasonable decision that makes particular investigations unnecessary." Id.* at 690–91, 104 S.Ct. at 2066 (emphasis added).

Although defense counsel might not have been told about the quilt by Sims, prior to trial McInturff was in possession of an FBI report that should have alerted him to the significance of the quilt for the defense. After the shooting, the state delivered the quilt to the FBI for examination. The FBI microscopically examined and chemically processed the area around the bullet holes in the quilt. The report stated that the tests revealed gunpowder residue on the quilt.

Such a report cannot be ignored. In this murder trial, the presence or absence of intent to inflict injury was pivotal. McInturff was aware that the prosecution, through Dr. Blake, would use the lack of powder marks on the victim to argue to the jury that Mrs. Sims was shot from a distance. The FBI report, however, disclosed facts that suggested that the state's theory was easily refutable. What is more, the FBI report presented the defense with a theory of the case that squared fully with Sims' version of events. As Dr. Burton noted in federal district court, "... this quilt may have the ability to trap virtually all the flake powder ... all the soot ... all the carbon.... Everything could be trapped by that quilt."

Counsel's failure to have the quilt examined by a defense expert, or to suggest to the jury that the quilt was an intermediary object between the gun and the victim, cannot be characterized as a reasonable exercise of professional judgment. In our view, counsel did not make a reasonable decision that further investigation of the physical evidence was unnecessary. Indeed, in state post-conviction proceedings, McInturff acknowledged that he made no "independent investigation" of the alleged crime and offered no explanation for why he did not take advantage of the FBI report.[1] We discern no strategy in McIn-

---

1. *Cf.* 1 ABA STANDARDS FOR CRIMINAL JUSTICE, Standard 4–4.1, at 4–53 (2d ed. Supp. 1986), entitled *Duty to investigate:*

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Commentary to Standard 4–4.1 notes that "[f]acts form the basis of effective representation.... Adequate investigation may avert the need for courtroom confrontation. The resources of scientific laboratories may be required to evaluate certain kinds of evidence: ... ballistics tests may be necessary. Neglect of ... these steps may preclude the presentation of an effective defense." *Id.* at 4–54.

Attorney McInturff also appears to have run afoul of ABA Standard 4–5.2, *Control and direction of the case, id.* at 4–65. Prior to representing Sims, McInturff made Sims sign a contract which stated in part:

All legal decisions will be made by McInturff. All tactical decisions will be made by him.

turff's failure to investigate the role of the quilt, only negligence. Therefore, we are of the opinion that counsel's failure to investigate key evidence may not be excused.[2] Sims, in short, did not receive reasonably effective assistance of counsel.

### B. *Prejudice*

Lastly, we address the prejudice prong of the *Strickland* analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. The test for evaluating the prejudice component is whether there is a reasonable probability that counsel's errors affected the outcome of the trial. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

It is our view that McInturff's conduct had a clear negative impact on the results of the trial. *See Rice v. Marshall*, 816 F.2d 1126, 1131–32 (6th Cir.1987). This is not a case where the evidence of the petitioner's guilt was so massive or multilayered as to render harmless defense counsel's errors. To the contrary, the state relied heavily upon the testimony of Dr. Blake to establish its theory that the gun was fired from a distance. Dr. Blake, however, never saw the quilt or the FBI report about the quilt. In light of the testimony of Mr. Fassnacht and Dr. Burton, we are persuaded that the

verdict against the petitioner is "more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069.

 In this habeas proceeding, the petitioner's burden, while substantial, does not require that he establish his innocence or even demonstrate "that counsel's deficient conduct more likely than not altered the outcome of the case." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2068. In order to establish prejudice, the petitioner need only show that had the quilt, its three bullet holes, and corresponding powder burns been presented to the jury, there is a *reasonable probability* that the jury's verdict would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The petitioner has met this burden. Counsel's errors undermine our confidence in the outcome of the Sullivan County trial.

### III.

Accordingly, we AFFIRM the judgment of the District Court granting the writ of habeas corpus and requiring retrial.

---

That is[,] how the case will be handled, who will testify, who will not testify. Any and all matters pertaining to the preparation of the trial. This *wholesale reservation of decision-making* power by counsel conflicts with Standard 4–5.2(a), which states that "[c]ertain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel." *Id.* (The Standard sets forth the division of decision-making power between attorney and client in paragraphs 4–5.2(a)(i)–(iii) and (b)). When it was brought to McInturff's attention that his contract violated this Standard, he replied that the Standards were

written by "a bunch of silk stocking birds that never tried a case probably." (Brief of Petitioner–Appellee at 9).

**2.** Although this is not an ineffectiveness case where counsel failed to present any defense, the fact that counsel advanced multiple defenses does not, in itself, establish effective assistance. Where, as here, the additional defense (self-defense) is not adopted by the defendant, is in conflict with facts testified to by the defendant, and is undermined by evidence not discovered by counsel due to counsel's inexcusable negligence, the mounting of multiple defenses does not automatically overcome a *Strickland* claim.