**Orlandus Carr LEONARD, Petitioner,**

v.

**People of the State of MICHIGAN, Respondent.**

**No. 1:00–CV–61.**

United States District Court,
W.D. Michigan,
Southern Division.

April 10, 2003.

Randall S. Levine, for Plaintiff.

Debra M. Gagliardi, for Defendant.

## *OPINION*

ENSLEN, District Judge.

This matter is before the Court on Respondent's Objections to Magistrate Judge Ellen S. Carmody's Report and Recommendation ("Report") of February 10, 2003, which recommended granting Petitioner's Petition for Writ of Habeas Corpus. The Court finds a hearing on this matter is not necessary.[1]

### I. Facts

The Court adopts the facts as stated in the Magistrate Judge's Report. Therefore, only a brief summary of the most critical facts is necessary.

In the early morning hours of August 30, 1986, two men unlawfully entered the apartment in which Shirley Martin lived with her boyfriend, William Osborn, and her daughter. The two men took Osborn out of the bedroom, where he was sleeping with Martin, tied him up, and put him in a closet. They then each raped Martin. After they left, the police were called and Martin was transported to a hospital to undergo a sexual assault evaluation. Several latent fingerprints were found at Martin's apartment, but police were unable to locate any suspects and the matter was placed in "inactive status." In February 1991, police identified all but one of the recovered fingerprints as belonging to Eric Schippers. Subsequent examination revealed the remaining fingerprint did not belong to Petitioner. Schippers was charged and pursuant to a plea agreement he agreed to plead guilty to charges of first degree criminal sexual conduct and

---

1. The Magistrate Judge appropriately determined that the record was sufficiently developed such that an evidentiary hearing was unnecessary. (Order, February 10, 2003, Dkt. No. 55). Neither party has objected to this Order. Briefly, the Court finds that in a case such as this, where there are no material factual questions remaining, an evidentiary hearing is not warranted. *Sawyer v. Hofbauer*, 299 F.3d 605, 609–11 (6th Cir.2002).

one count of armed robbery and to identify and testify against his accomplice. In return, the prosecution agreed to drop the remaining two charges and to recommend Schippers receive a sentence of 12–30 years. Schippers identified Petitioner as his accomplice. When asked by an officer whether there existed in his mind any question that it was Petitioner who assisted him, Schippers replied, "yeah, that's the only person I can think of, and I'm pretty sure that that was the person who was with me." (Preliminary Examination Transcript, August 18, 1992, Dkt. No. 14, 95.) At trial, Schippers testified he was positive Petitioner was with him that night. (Trial Transcript, May 11, 1994, Dkt. No. 17, 93).

Petitioner was ultimately charged with and after a bench trial in 1994, convicted of first degree criminal sexual conduct, armed robbery, and breaking and entering. He was sentenced to a term of 18–40 years imprisonment. Following his conviction, Petitioner filed a claim for appeal of his conviction and a few months later he filed in the trial court a motion for a new trial. The trial court granted Petitioner a new trial after finding he was entitled to have an expert help him and he had none at his initial trial. Respondent appealed this decision and the Michigan Court of Appeals consolidated the two appeals. In

his subsequent brief to the Michigan Court of Appeals, Petitioner raised numerous issues including a claim of ineffective assistance of counsel. The Michigan Court of Appeals affirmed Petitioner's conviction and reversed the trial court's order granting Petitioner a new trial. The court later denied Petitioner's motion for rehearing. The Michigan Supreme Court denied Petitioner's application for leave to appeal in which he also asserted a claim of ineffective assistance of counsel. Nearly a year later, Petitioner filed the present petition in which he asserted six grounds for issuance of a writ of habeas corpus. Petitioner was first represented by retained counsel, Richard Stroba, who retained the services of DNA expert, Benjamin Grunbaum, Ph.D.[2] Mr. Stroba sought Dr. Grunbaum's assistance in evaluating DNA evidence and preparing for a suppression hearing and trial. He provided Dr. Grunbaum with materials he received from the Michigan State Police crime laboratory.[3] When Petitioner could no longer afford Mr. Stroba's services, the Court appointed James Narregan to represent Petitioner. Only Mr. Narregan's actions and inactions are at issue in the present matter. The Magistrate Judge recommended granting Petitioner writ of habeas corpus only on the basis of his ineffective assistance of counsel claim.[4] Respondent objects to

**2.** Dr. Grunbaum earned a Ph.D. in biochemistry from the University of California, as well as a master's degree in criminalistics. (Grunbaum affidavit at 2). He has been employed since approximately 1979 as a consultant in analytical biochemistry, and has assisted both prosecuting attorneys and defense attorneys. *Id.* Dr. Grunbaum has been qualified to testify as an expert in several states including Michigan. *Id.*

**3.** Dr. Grunbaum informed Mr. Stroba that he believed discovery was incomplete and the defense had not been provided with all of the DNA analysis materials generated in the case. (Grunbaum Affidavit at 3). To the Court's

knowledge, Dr. Grunbaum never received the additional material.

**4.** Petitioner also sought writ of habeas corpus on five other grounds: trial court properly found Petitioner was denied a fair trial because he did not have a DNA expert; trial court erroneously denied Petitioner a continuance to obtain a necessary expert; Petitioner was entitled to a new trial because his waiver of jury trial was invalid; DNA evidence was invalid; and Petitioner was denied right to appeal. The Magistrate Judge recommended dismissal of these claims. As there were no objections to the recommendation, the Court adopts it and will not address these grounds.

that recommendation and the Court now takes up the matter.

## II. Standard of Review and Applicable Federal Rules

■ This Court performs a *de novo* review of specifically objected to sections of a magistrate judge's report; the court may accept, reject, or modify the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b); L. Civ. R. 72.3(b); *Lardie v. Birkett,* 221 F.Supp.2d 806, 807 (E.D.Mich.2002). In conducting its review, the court may not reconsider state court decisions on state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.*

The district court's review of state court decisions on any grounds is further limited by the Antiterrorism and Effective Death Penalty Act ("AEDPA") passed by Congress in April 1996. 28 U.S.C. § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Therefore, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.... [A] federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (concurring opinion).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

B. Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C. The state court decision may be overturned only if:

1. It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' or; The Supreme Court precedent must exist at the time of petitioner's direct appeal.

2. the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

3. 'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

4. the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D. Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' '[A]n unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E. Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell*, 271 F.3d 652, 655–56 (6th Cir.2001) (internal citations omitted); *see also Williams*, 529 U.S. at 411, 120 S.Ct. 1495 (concurring opinion) (stating "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly .... that application must also be unreasonable").

## III. Analysis

Petitioner challenges the Michigan Court of Appeals' denial of his claim of ineffective assistance of counsel. This Court reviews that decision to determine if it was reasonable in terms of clearly established Federal law, as determined by the Supreme Court, in light of evidence presented at the State court proceeding. "[A] federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120

S.Ct. 1495. The Supreme Court established the rule of law regarding ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Objective review of the facts demonstrates Petitioner's defense counsel did not insure Petitioner was provided a fair trial having a just result as required by the Sixth Amendment of the United States Constitution. *Id.* at 685–86, 104 S.Ct. 2052. It was unreasonable for the Michigan Court of Appeals to find otherwise.

In order to reach the conclusion that the Michigan Court of Appeals applied *Strickland* unreasonably, the Court first outlines the standard for finding ineffective assistance of counsel and then reviews the Michigan Court of Appeals decision highlighting where it was unreasonable in light of the aforementioned standard.

### A. *Strickland* Standard

The Sixth Amendment right of assistance of counsel is not merely a general right to assistance of counsel, but a right to *effective* assistance of counsel. *Strickland*, 466 U.S. at 685–86, 104 S.Ct. 2052 (citing *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). Effective assistance of counsel means that the attorney must help guarantee the trial is fair by ensuring "that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* at 687, 104 S.Ct. 2052.

In order to state a claim of ineffective assistance of counsel sufficient to warrant reversal of a conviction, a convicted defendant must demonstrate two conditions.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. While counsel is presumed to have been effective, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052.

## B. Unreasonable Application of *Strickland* Standard

Upon review of the record, the Court finds the Michigan Court of Appeals erred in finding Petitioner was not denied effective assistance of counsel. Defense counsel's overall ignorance of DNA analysis and lack of preparedness rendered his assistance in this case ineffective. The fact that the court of appeals found differently is unreasonable as will be shown by a review of the facts.

### 1. Michigan Court of Appeals Summarily Rejected Petitioner's Claim

The Michigan Court of Appeals addressed Petitioner's ineffective assistance of counsel claim in two sections of its opinion: with respect to counsel's failure

to obtain a DNA expert and with respect to counsel's failure to contact and call alibi witnesses. Only the former is relevant to the present discussion as the Magistrate Judge recommended dismissal of the claim on the latter basis and neither party objected to that recommendation. Therefore, the following discussion of Petitioner's ineffective assistance of counsel claim refers only to defense counsel's failure to obtain and consult with a DNA expert.

The court of appeals never undertook an analysis of whether defense counsel's assistance was defective or whether Petitioner was prejudiced by his deficient performance. Instead it determined that, "[t]o the extent that defendant raised a claim of ineffective assistance of counsel on the basis of not having a DNA expert, the record does not reflect that defense counsel's performance was deficient or that defendant was prejudiced by defense counsel's performance. [*People v.*] *Pickens,* [521 N.W.2d 797, 799 (1994) ]." [5] *People v. Leonard,* 224 Mich.App. 569, 569 N.W.2d 663, 671 (1997). This statement followed a two paragraph analysis of why Petitioner was not entitled to an expert, but otherwise referenced no basis for its conclusion.

As part of its discussion on whether Petitioner was entitled to an expert, the court of appeals reviewed defense counsel's various failures in demonstrating Petitioner's need for an expert. For example, the court noted defense counsel's request for an expert was untimely and defense counsel failed to file a formal motion for an expert. *Id.* Yet, somehow, in the next paragraph, the court determined defense counsel was not ineffective. The Court finds it disturbing that despite concluding defense counsel's deficiencies were at least in part to blame

---

**5.** In *People v. Pickens,* the Michigan Supreme Court adopted the *Strickland* standard for in- effective assistance of counsel claims.

for Petitioner's failure to demonstrate a need for an expert, the court of appeals summarily determined that defense counsel's assistance was not deficient.

## 2. Court of Appeals Unreasonably Determined Defense Counsel was Knowledgeable and Effectively Cross–Examined State's Witnesses

After identifying defense counsel's failure to follow procedure, the court of appeals highlighted his knowledge and understanding of DNA analysis as proof that Petitioner did not need an expert. The Court finds those conclusions unreasonable in light of the trial court's findings, defense counsel's own statements, and an objective reading of the relevant transcripts. Even if this Court were to accept those findings, they do not demonstrate a reasonable basis for finding defense counsel satisfied Sixth Amendment requirements in this case as they only indicate a rudimentary familiarity with issues surrounding DNA analysis and not an ability to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (citing *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).

To begin, the court of appeals stated, "defense trial counsel exhibited an understanding of the scientific evidence and effectively and comprehensively cross-examined the prosecution's experts." *Leonard,* 569 N.W.2d at 671. In support of this conclusion the Court of Appeals first cited defense counsel's undergraduate degree in chemistry with a minor in biophysics. *Id.* This says little to nothing about defense counsel's knowledge or ability in the area of DNA analysis since defense counsel's degree was obtained approximately 35 years ago, before the advent of forensic DNA testing in the mid-late 1980s. (Motion to Suppress Hearing, March 8, 1994, 24). The court then cited defense counsel's request for documents, exhibits, and notes as proof of his preparedness. *Id.* The court ignored the fact that defense counsel did not make these requests until the suppression hearing, despite having had six months in which to prepare for the suppression hearing and access to the expert with whom retained counsel had been working. Also, his request was to receive copies of the documents after the hearing. He therefore, could not cross-examine the experts with the benefit of having reviewed the papers upon which they relied in testifying.

The court of appeals found defense counsel's familiarity with terminology, major research publications, and cases regarding DNA analysis allowed him to effectively and extensively cross-examine the State's experts.[6] *Id.* The court cited one exchange in particular to demonstrate defense counsel's effective cross-examination in which the State's expert at trial agreed no two people have the same fingerprints, but two people may have one or two probes of identical DNA.[7] *Id.;* (Trial Transcript, May 17, 1994, Dkt. No. 20, 75). The remainder of the expert's response was that two people are unlikely to have three identical probes and overall, no two

---

**6.** The Court will not reiterate the specific deficiencies in defense counsel's cross-examinations of the State's experts as the Magistrate Judge did a commendable job in that area. After review of the record, the Court agrees defense counsel's cross-examination of the State's experts was completely deficient in light of the critical importance that evidence played in determining guilt. This is discussed further later in this Opinion.

**7.** A probe refers to a technique used to identify a sequence of DNA by using a solution of "genetic probes." Different solutions identify different sequences and the more probes that match, the more likely the individual's DNA is a match to the sample DNA.

people have the same DNA. (Trial Transcript, May 17, 1994, Dkt. No. 20, 75). The expert's complete answer indicated that defense counsel proved nothing by obtaining the initial admission. Furthermore, the State's evidence showed Petitioner's DNA had a three probe match with the DNA found at the crime scene. (Motion to Suppress Hearing, March 8, 1994, 63). More than one of the State's experts testified to the conclusiveness of such a match. *Id.* at 109, 133; (Trial Transcript, May 17, 1994, Dkt. No. 20, 26).

Defense counsel's cross-examination of the State's experts was minimal and failed to address any areas of controversy, such as methodology, human error, contamination, lack of expertise, or bias. (Grunbaum affidavit at 4–10).[8] As stated earlier, the Magistrate Judge went into great detail describing deficiencies in defense counsel's cross-examinations of the State's experts and the Court will not repeat that here. Briefly, the Court was struck by the brevity of defense counsel's cross-examinations considering the gravity of the evidence presented and his avoidance of admitted problems with the DNA testing in this case. At one point, defense counsel told a witness he did not intend to cross her in her area of expertise, with regard to her matches. (Motion to Suppress Hearing, March 8, 1994, 65). Instead he spent his time asking whether the experts were familiar with the debate amongst scientists over the statistical analysis done in the type of DNA analysis known as Restriction Fragment Length Polymorphisms ("RFLP") testing (which was the type done in this case). Unfortunately, because

he only had a superficial knowledge of the debate, he was not able to counter the State's experts' claims that the controversy was minimal and virtually resolved at this point. (Grunbaum Affidavit at 10). After the suppression hearing, defense counsel agreed to stipulate to admission of the experts' testimony at the hearing at trial, relieving the prosecutor of the burden of having to recall those experts. As a result, defense counsel also relieved himself of the opportunity to cross-examine those experts at trial, even though the issue at trial, weight of the DNA evidence, was different from the issue at the suppression hearing, which was admission of the DNA evidence.

Defense counsel never challenged the validity of the DNA analysis even though identification of Petitioner's DNA was done pursuant to a different procedure from that used to identify the DNA in the samples from the crime scene and Schipper's DNA. (Suppression Hearing Transcript, March 8, 1994, 68–69). Additionally problematic is that because Petitioner's DNA sample was identified after extraction and identification of the DNA from the crime scene samples, the State performed an "intergel comparison." (Suppression Hearing Transcript, March 8, 1994, 30). This means the State did not use the same technique and compounds when extracting and identifying the DNA from the crime scene as it used when extracting and identifying Petitioner's DNA. *Id.* The significance of this unfortunately was never explored. (Grunbaum's Affidavit at 8). More fundamentally, de-

8. Respondent argues Dr. Grunbaum is not qualified to render an opinion on whether defense counsel was effective. The Court does not refer to his affidavit for that reason, but to indicate areas of deficiency in defense counsel's examination in light of this Court's limited scientific knowledge. The Court draws its own conclusions as to whether those deficiencies constitute ineffective assistance of counsel. The Court finds Dr. Grunbaum is qualified to highlight areas where the State's experts could have been challenged and their testimony attacked, as well as areas in which he could have assisted defense counsel in preparing for the case and in conducting a damaging cross-examination.

fense counsel accepted without question testimony from experts regarding the scientific community's general acceptance of RFLP analysis as done by the Michigan State Police and its validity. (Grunbaum Affidavit at 7–8).

This Court does not mean to suggest defense counsel needed to be an expert in DNA analysis to satisfy Sixth Amendment standards. There are instances where legitimate litigation tactics advise against rigorous cross-examination, but that is not the case when guilt turns on the credibility of the State's experts' testimony. Defense counsel's 35–year–old chemistry degree was not up to the task of providing Petitioner a meaningful adversarial trial.

> The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has written: 'While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.'

*United States v. Cronic,* 466 U.S. 648, 656–57, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quoting *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.1975)). Defense counsel lacked the tools necessary to challenge the State's case. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (internal citation omitted) (stating "[c]ounsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process"). As a result, Petitioner's trial was far from a meaningful adversarial testing.

■ Defense counsel's failure to investigate prior to the suppression hearing was not a reasonable decision. The Court would not have expected defense counsel to have had a professional knowledge of DNA testing. Rather, it would have expected defense counsel to recognize the issue at the suppression hearing and prepare accordingly. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Reading an academic article and a few cases is not sufficient in a case where the critical evidence is complicated biological evidence requiring expert understanding to challenge. It is clear defense counsel failed to prepare for the suppression hearing and trial. This failure was unreasonable.

### 3. Court of Appeals Unreasonably Ignored the Trial Court's Findings

■ Well established doctrine recognizes trial courts have an advantage over appellate courts by attending the hearings rather than relying upon the cold record. In spite of this, the Court of Appeals blatantly ignored the conclusion of the trial judge who conducted Petitioner's bench trial that Petitioner's trial was "the greatest miscarriage of justice" with which he had ever been connected. (Bond Motion Transcript, August 27, 1997, 16–18). Eight months after being assigned the case, defense counsel had still not retained an expert, to the trial judge's surprise. (Hearing Transcript, June 6, 1995, 33–35). The trial judge stated the DNA evidence

was a major part of the evidence and he "credited the DNA experts. They [the State's experts] didn't have any opposition." *Id.* He later stated it was his error to leave ineffective counsel on the case and acknowledged the importance the expert witnesses played in the case and in his decision. (Bond Motion Transcript, August 27, 1997, 16–18).

> That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Strickland*, 466 U.S. at 685–86, 104 S.Ct. 2052 (citing *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). Petitioner cannot be said to have received a fair trial when the central evidence against him went virtually uncontested and the trial judge acknowledged his ineffectiveness on the record.

The court of appeals did not so much as reference the trial court's comments regarding defense counsel's deficiencies and its own failure to recognize them earlier. It was unreasonable for the court of appeals to disregard the statements of the trial court which had the benefit of presiding over the hearings and trial. This Court is persuaded by the conclusions of the trial court and believes they should be given due deference in deciding this matter.

### 4. Court of Appeals Unreasonably Ignored Defense Counsel's Own Admissions of Ignorance and Lack of Preparedness

Perhaps most glaring is that the court of appeals ignored defense counsel's own statements acknowledging his lack of preparedness and ignorance with respect to DNA analysis. Defense counsel's statements are supported by numerous examples of his lack of preparation, beginning with his failure to follow up with Dr. Grunbaum earlier than four days before the suppression hearing and continued by his failure to hire an expert by the first day of trial, eight months after he was appointed, despite his admitted ignorance with respect to DNA analysis. While a court should not critique an attorney's performance with the benefit of hindsight, *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir.1992) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052), in this case, the Court is only reiterating what the trial judge identified as defense counsel's deficiencies and accepting defense counsel's own statements.

Defense counsel prefaced his cross-examination of the State's one DNA expert testifying at trial, Dr. Conneally, with reference to the adage "[i]t is better to sit in silence and appear ignorant, than to open your mouth and remove all doubt."[9] (Trial Transcript, May 17, 1994, Dkt. No. 20, 64–65). He acknowledged his ignorance of matters Dr. Conneally testified to by stating that his undergraduate degree helped him to "read somewhat for entertainment rather than for content the NRC [National Research Council] Report that you alluded to." (Trial Transcript, May 17, 1994, 66). His cross-examination filled 13 pages of transcript when the State had conducted a

---

**9.** Attributed to Mark Twain. Defense counsel related two stories about two men he greatly admired both of whom he claimed taught him the lesson summarized in the above quotation.

54–page direct examination of Dr. Conneally. During his cross, defense counsel remarked more than once he lacked the benefit of having a little bird whispering questions in his ear as the prosecutor had. (Trial Transcript, May 17, 1994, Dkt. No. 20, 65,78). "Where counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman,* 957 F.2d at 1345 (internal citations omitted). Even defense counsel bemoaned his lack of assistance, though he could only blame himself for his "Lone Ranger" stance. (Trial Transcript, May 17, 1994, Dkt. No. 20, 65) ("As you'll note, I have no expert, I have nobody, as does Miss Hungerford [the prosecutor] here, seated immediately to her right feeding her questions.").

■ At the suppression hearing and during trial, defense counsel had to ask for copies of documents to which witnesses were referring and conducted cross-examination without familiarity with the documents. "[A] failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted." *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994); *Sims v. Livesay,* 970 F.2d 1575, 1581 (6th Cir.1992) (finding ineffective assistance of counsel when defense counsel failed to examine a critical piece of evidence that called into question the prosecutions's theory of the case). How defense counsel could have proceeded to trial, knowing the critical piece of evidence against his client was DNA evidence, without first reviewing the experts' reports, protocol, and analysis is almost incomprehensible and certainly unreasonable. Defense counsel's almost complete lack of preparation for this trial is indefensible. He himself admitted he lacked the requisite knowledge to question the experts and expressed jealousy for the prosecutor's access to an expert. In light of the circumstances of this case and the central role the DNA evidence played in conviction, defense counsel's lack of preparation is the definition of ineffective assistance of counsel and for the court of appeals to have found otherwise is unreasonable.

### 5. Prejudice

Under *Strickland,* in order to demonstrate ineffective assistance of counsel, a defendant must show defense counsel was deficient and prejudice to the defendant resulted from defense counsel's deficiency. A defendant demonstrates prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This Court must determine "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. The trial court stated on the record that had defense counsel presented a DNA expert, he likely would have decided the case differently. At Petitioner's bond hearing, the trial judge indicated he believed testimony of a defense expert would have made a difference in the outcome of the trial. (Bond Motion Transcript, August 27, 1997, 16–18).

The only evidence against Petitioner was the testimony of Eric Schippers who had to identify and testify against his accomplice as part of his plea bargain and the State's DNA experts' testimony and findings. Schipper's credibility is questionable as he initially equivocated when asked if Petitioner was with him the night of the

crime and acknowledged his willingness to do anything to reduce his time in prison. As discussed above in detail and in the Magistrate Judge's Report, the DNA evidence went uncontested despite flaws in the analysis and gaps in the expertise of those who performed and analyzed the tests. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. The Court finds Petitioner was deprived of a fair trial in this matter. There is a reasonable probability that had defense counsel offered any defense to the State's DNA experts, the trial judge would have found Petitioner not guilty. In light of the lack of evidence against Petitioner, this is the only conclusion that can reasonably be reached.

Because there was "a breakdown in the adversary process caused by deficiencies in counsel's assistance," *Strickland,* 466 U.S. at 700, 104 S.Ct. 2052, the Court finds the Michigan Court of Appeals decision unreasonable and grants Petitioner's petition for writ of habeas corpus.

## IV. Conclusion

Therefore, the Court will deny Respondent's Objections. The Court will adopt Magistrate Judge Carmody's Report. The Court concludes Petitioner is being confined in violation of the Sixth Amendment of the United States Constitution and will grant his petition for writ of habeas corpus. The State of Michigan shall either release Petitioner from custody or afford him a new trial within 120 days.